# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 13

October Term, A.D. 2020

January 27, 2021

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.

NICK EDWARD BEDUHN, WSB #
6-3763,

Respondent.

D-16-0007
D-17-0007

## ORDER REINSTATING ATTORNEY TO THE PRACTICE OF LAW

[¶ 1]   **This matter** came before the Court upon the "Stipulation for Reinstatement Pursuant to Rule 26(b)(6)(B)," filed herein January 5, 2021, by a hearing panel of the Board of Professional Responsibility for the Wyoming State Bar.  By order entered August 24, 2017, this Court suspended Respondent from the practice of law for two years, with the period of suspension to begin May 10, 2017, the date this Court entered an "Order of Immediate Suspension." *Bd. of Prof'l Responsibility, Wyoming State Bar v. Beduhn*, 2017 WY 97, 402 P.3d 950 (Wyo. 2017).  Later, this Court suspended Respondent for an additional six months, with that suspension to run consecutively to the two-year suspension.  *Bd. of Prof'l Responsibility, Wyoming State Bar v. Beduhn*, 2017 WY 139, 406 P.3d 1220 (Wyo. 2017).  Respondent subsequently sought reinstatement.  Now, after a careful review of the Board of Professional Responsibility's "Stipulation for Reinstatement Pursuant to Rule 26(b)(6)(B)," and the file, this Court finds that the Stipulation should be approved, confirmed and adopted by the Court; and that the Respondent, Nick Edward Beduhn, should be reinstated to the practice of law.  It is, therefore,

[¶ 2]   **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's "Stipulation for Reinstatement Pursuant to Rule 26(b)(6)(B)," which is attached hereto and

incorporated herein, shall be, and the same hereby is, approved, confirmed and adopted by this Court; and it is further

[¶ 3] **ADJUDGED AND ORDERED** that the Respondent, Nick Edward Beduhn, be, and hereby is, reinstated to the practice of law in Wyoming, effective immediately; and it is further

[¶ 4] **ORDERED** that, pursuant to Rule 9(b) Wyoming Rules of Disciplinary Procedure, this Order Reinstating Attorney to the Practice of Law, along with the incorporated "Stipulation for Reinstatement Pursuant to Rule 26(b)(6)(B)," shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶ 5] **ORDERED** that the Clerk of this Court shall docket this Order Reinstating Attorney to the Practice of Law, along with the incorporated "Stipulation for Reinstatement Pursuant to Rule 26(b)(6)(B)," as a matter coming regularly before this Court as a public record; and it is further

[¶ 6] **ORDERED** that the Clerk of this Court transmit a copy of this "Order Reinstating Attorney to the Practice of Law" to the members of the Board of Professional Responsibility and to the clerks of the appropriate courts of the State of Wyoming.

[¶ 7] **DATED** this 27th day of January, 2021.

BY THE COURT:

/s/

**MICHAEL K. DAVIS**
**Chief Justice**

**BEFORE THE SUPREME COURT OF THE STATE OF WYOMING**

IN THE SUPREME COURT
STATE OF WYOMING
FILED

In the matter of          )

NICK EDWARD BEDUHN,     )

WSB No. 6-3763,           )

                    )

     Respondent.         )

JAN - 5 2021

SHAWNA GOETZ, CLERK

Nos. D-16-0007 & D-17-0007

---

## STIPULATION FOR REINSTATEMENT PURSUANT TO RULE 26(b)(6)(B)

---

THIS MATTER came before a Review Panel of the Board of Professional Responsibility on the 15th day of December, 2020, for consideration of Respondent's Verified Petition for Reinstatement. Present for the video hearing were Review Panel members Jeffrey A. Donnell, chair, John A. Masterson, lawyer member, and Alisha Rone, lay member. Also in attendance were Nick Edward Beduhn, Respondent, Mark W. Gifford, Bar Counsel, and Brandi Robinson, BPR Clerk. The Review Panel, having reviewed the Verified Petition for Reinstatement, parties' Stipulation for Reinstatement, the supporting affidavit of Respondent and being fully advised in the premises, finds, concludes and recommends:

### Findings of Fact

1.      In 2016 and 2017, six complaints against Respondent were received by the Office of Bar Counsel. Together, the complaints told the story of a lawyer who was operating in a way that evidenced profound neglect of his clients. Clearly, Respondent's law practice had gotten away from him. In the face of mounting evidence that Respondent's clients were suffering as a result, Bar Counsel filed a petition for Respondent's immediate suspension pursuant to Rule 17, W.R.Disc.P. The Wyoming Supreme Court granted Bar Counsel's petition and issued an order of Respondent's immediate suspension effective May 10, 2017.

2. Five of the complaints were consolidated in a formal charge that was heard by the Board of Professional Responsibility (BPR) in June 2017. The BPR found clear and convincing evidence of Respondent's neglect of numerous clients and recommended that the Court suspend Respondent's license for a period of two years. Further, the BPR recommended that Respondent be required to reimburse one of the Complainants the amount of $1,075.85, that Respondent be required to pay administrative fees of $3,750.00 ($750.00 for each of the five complaints that were consolidated in the formal charge), and that Respondent be required to pay costs in the amount of $5,475.18 to the Wyoming State Bar. In an order dated August 24, 2017, the Court adopted the BPR's report and recommendation in all respects and suspended Respondent from the practice of law for a period of two years, effective May 10, 2017, the date of Respondent's immediate suspension. *See Bd. of Prof. Resp. v. Beduhn*, 402 P.3d 950 (Wyo. 2017).

3. A sixth complaint against Respondent was submitted by a client in March 2017. Respondent failed to respond to Bar Counsel's letters of inquiry regarding the complaint. As a result, Bar Counsel obtained authority to file a second formal charge against Respondent, which was heard by the BPR in a telephonic hearing in October 2017. Finding clear and convincing evidence of Respondent's violation of numerous Rules of Professional Conduct in the nature of client neglect, the BPR recommended that Respondent be suspended for an additional six months, that he reimburse the client in the amount of $1,000.00, that he be ordered to pay an administrative fee of $750.00 and that he be required to reimburse the Wyoming State Bar for costs in the amount of $605.15. In an order dated November 22, 2017, the Court adopted the BPR's report and recommendation in all respects and suspended Respondent from the practice of law for an additional six months beginning May 10, 2019. *See Bd. of Prof. Resp. v. Beduhn*, 406 P.3d 1220 (Wyo. 2017).

4.     Prior to taking a wrong turn in 2016, Respondent was recognized by his peers throughout the state as a capable and industrious trial lawyer. For example, he represented Sergei Yates in an action to recover funds that had been embezzled by Cody attorney Jody Vannoy from a trust of which Yates was the beneficiary. Yates, a Russian orphan, had been adopted by a well-to-do New Jersey couple, Charles and Anya Yates. Sergei's adoptive parents and two siblings were killed in a plane crash on October 10, 2000.[1] A trust was set up for Sergei, funded by his mother's estate. Through an unlikely series of events, Vannoy was appointed trustee of Sergei's trust and proceeded, over a period of several years, to divert trust assets to her own use.

5.     Respondent, just a few years out of law school at the time, successfully prosecuted the civil action against Vannoy and, after two years of tortured proceedings, obtained a judgment against her in the amount of $695,565.31 in August 2012. Respondent also testified at Vannoy's disbarment hearing in December 2012. *See Bd. of Prof. Resp. v. Vannoy,* 296 P.3d 926 (Wyo. 2013).[2]

6.     For those familiar with Respondent and his reputation as an up-and-coming trial lawyer, it seemed incongruous that his practice would take such a bad turn just a few years after his exemplary representation of Sergei Yates. Respondent's affidavit of factual basis explains in blunt terms how his law practice became derailed. "Around 2011, I became the Supervising Public Defender of Park and Big Horn Counties. During this time, I also presented at the Public Defender conferences and became qualified to defend death penalty cases. I traveled the state and defended numerous other murder cases, managed my private office, and raised a family."

7.     Looking back, Respondent reflects, "One of the biggest issues was just not having time for all I was doing in 2016-2017. Since then I have slowed down and want the same for my

---

[1] *See* https://www.nytimes.com/2000/10/10/nyregion/charles-b-yates-61-banker-and-ex-new-jersey-legislator.html.
[2] For more about the strange case of Sergei Yates, see https://powelltribune.com/stories/lost-trust-lawyer-forfeits-license-office.5288.

3

practice. At that time, I had over a hundred Public Defender cases, including high profile murders, in addition to approximately forty private practice cases. This does not even take into consideration the amount of traveling I was doing. Frankly, I was overworked."

8. According to Respondent, things came to a head late in 2016: "In 2016, the juggling of way too many balls in the air started to catch up. My daughter was sixteen and my son was six years old. In reviewing the twenty-nine page Report and Recommendation for Two Year Order of Suspension, it certainly brought back a lot of memories of what my life was like back then. I remember in December 2016, I was packing my bags to head to Cheyenne for another murder case. In that instant, I was wondering what I was doing. I packed my suitcase for three weeks. I was headed there for either three days of motion hearings and potentially settling the case, or I would be there for three weeks for a full blown not guilty by reason of mental illness (NGMI) murder trial. Leaving my children behind, hoping they would be taken care of, all the while not taking care of myself or my practice."

9. With the benefit of hindsight, Respondent acknowledges that his practice had gotten away from him: "I was everywhere but nowhere. There was a lack of diligence, competence, and communication with my clients. Clients were upset, and Judges did not understand what was happening with my private and Public Defender practice. Everyone saw the oncoming train wreck but me. I took on more than I should, and my practice reflected this in 2016 and 2017."

10. Following his suspension, while living off the remains of his retirement account, Respondent apprenticed with Freedom Fighter Bail Bonds, a company owned by a friend. In this position, Respondent was responsible for daily or weekly check-ins with clients of the bonding company. Respondent describes this as an eye-opening look at the criminal justice system from

4

an entirely different perspective. As stated in his affidavit, "The biggest complaint of all from the people I monitored was not being able to speak with their attorney. Because of all the contacts I created across the state, I could normally assist them with this basic element of the attorney-client relationship. This made me realize how so many of my clients felt. A simple three-minute phone call can relieve the stress of a client who is walking blindly through a judicial system that is very foreign to most. *** It provided a perspective that was new to me and one that makes me more fully appreciate the communication aspect of the attorney-client relationship."

11. In 2018, Respondent moved from Cody to Buffalo. While continuing his work with the bail bonding company, he became involved with the Incarceration Diversion Program, a pilot program administered by Judge Edelman. As described by Respondent, the program "looks and feels like private probation but has a more therapeutic element than what standard probation can offer. I assisted [the program coordinator] with breathalyzers, monitoring, and the occasional drug testing. I also helped her consult with several clients, and I would go to court with her to offer support or provide letters of recommendation on behalf of her clients. I still assist her, and the program, when called upon. I have never been compensated financially for my time involved, and I never requested it. I looked at it as another opportunity to participate in the judicial system."

12. In his petition for reinstatement, Respondent disclosed an incident in which he filed a motion to set aside a bond forfeiture in the Sixth Judicial District Court on behalf of Freedom Fighter Bail Bonds. In his affidavit, Respondent explains, "The case was *State of Wyoming v. Christopher Johnson*, CR-8415, in Judge Rumpke's court. During my apprenticeship with Freedom Fighter Bail Bonds, I was made a member of the corporation for this purpose so that we could represent the corporation without the cost of an attorney.

5

Unbeknownst to me, there is a Uniform District Court Rule that explicitly prohibits this. UDCR 101(b) states, 'Corporations and unincorporated associations (other than partnerships and individual proprietorship(s)) may appear only through an attorney licensed to practice in Wyoming.' Judge Rumpke was polite enough to point this rule out, and I agreed. I asked to withdraw the motion and told the Court that we would hire an attorney to properly address a motion filed by a licensed attorney. I was ignorant of this rule. Shortly thereafter, I contacted Bar Counsel and told him my mistake. There was not a formal investigation and he thanked me for letting him know."

13. Respondent further explains, "It was an honest mistake, and I take full responsibility for not knowing the UDCR 101(b). I believe the bond was $10,000 and I was trying to help the company and save some costs. The background of the case was that Mr. Johnson failed to appear for his sentencing and was originally charged with a felony for Possession with Intent to Distribute for Marijuana. As he was a fugitive who fled to Oregon, I was able to use my contacts with the U.S. Marshal's offices in Wyoming and Oregon to assist in Mr. Johnson's apprehension. Mr. Johnson was found in southern Oregon by the U.S. Marshal's Fugitive Task Force and transported back to Wyoming to face his pending charge. Attorney Mike Fuller was contacted and he represented the corporation. The bond was not forfeited. This was as close as I came to practicing law in the last three years. I do not believe this rises to a level that would not allow reinstatement of my license."

14. Bar Counsel concurs. Rule 7 of the Rules Governing the Wyoming State Bar and the Authorized Practice of Law provides, "Any person may act pro se in a matter in which that person is a party." Respondent had the mistaken notion that there was nothing improper about filing a motion on behalf of a company of which he was a member. When the applicable rule was

6

brought to Respondent's attention by Judge Rumpke, Respondent promptly self-reported the incident to Bar Counsel, claiming that it was an honest mistake on his part. Further, Respondent took prompt remedial measures. In Bar Counsel's opinion, Respondent's action in filing the motion should not disqualify him from reinstatement.

15.    The Review Panel finds that Respondent's single transgression, which was promptly remedied and not repeated thereafter, should not disqualify him from returning to the practice of law.

16.    As he explains in his affidavit, Respondent did not make the decision to seek reinstatement lightly. Though he became eligible to seek reinstatement on November 10, 2019, Respondent was not certain that he wanted to return to practice. As Respondent explains, "After the summer of 2020 and after a lot of soul searching, I decided I was ready. I saw too many injustices, heard too many stories of inadequate representation. I knew I had to get back. I believe I have something to offer to the people of Wyoming, the bar, and want to continue to assist the judicial system."

17.    Once he made the decision to seek reinstatement, Respondent set about preparing himself for a return to practice in earnest:

- "Prior to filing my petition for reinstatement, the first thing that I did was review the Law Office Self-Audit Checklist on the Wyoming State Bar's webpage. This will be my main guideline for my practice."
- "After that, I found a wonderful CLE that Ms. Kate Strike put on for solo or small practices. This was certainly enlightening and provided wonderful ideas."
- "I made an appointment with a local accountant, who will be of great assistance. Their company provides the ability to send monthly bills, and I'll be able to keep hourly logs daily through their app. They do this through an encrypted cloud-based QuickBooks. The app can also keep track of mileage. This will simplify the day-to-day operation of my law practice."
- "Next, I met with my local bank officer to set up an IOLTA account and operating account. They are ready for my information from the Secretary of State. I did wait to file with the Secretary of State until my meeting with the accountants to see what type of corporation would provide the best tax outcome."

7

- "Then, I went to work on a business plan that incorporated my vision for my law practice going forward. I decided that checks and balances must occur on a daily and weekly basis. These include, but are not limited to, weekly communication with clients, protecting confidentiality, creating a conflict screening program, an intake sheet, engagement letter with signature line for the clients, case management review weekly, taking on a limited number of cases, descriptive billing for all civil cases (civil cases will be kept to a minimum), and closing letters."
- Since October 2020, Respondent has completed more than 20 hours of CLE including 8 hours of ethics. He is compliant in completing his required hours for 2019 and well on his way to satisfying the required hours for 2020.
- Respondent has paid his license fees for 2020-2021 and is current on all fees and other assessments.

18. In his affidavit, Respondent expresses profound regret over his conduct in the 2016-2017 timeframe. In Respondent's words, "I recognize that who I was in 2016-2017 was an attorney who bit off more than he could chew, and my clients suffered more than can be described, even in the Board of Professional Responsibility's reports and recommendations." In support of his belief that he has been rehabilitated, Respondent reflects, "I can look back at the inadequate representation I provided with much embarrassment, regret and chagrin. I can look towards the future, and fully see what it will take to practice like I know how and how I started in this profession. I might have taken a longer road to get to this point, but I know it was for a reason. I needed more self-reflection and thoughtfulness before I knew it was time to come back to the practice of law."

19. Respondent asserts, and Bar Counsel concurs, that Respondent has met the requirements for reinstatement set forth in Rule 22(b)(4), W.R.Disc.P.

20. Respondent has complied with all requirements of the Court's two orders of suspension. As discussed above, what might have been a brush with the unauthorized practice of law was unintentional, quickly averted and self-reported to Bar Counsel.

21. Bar Counsel has had extensive communications with Respondent since he decided to seek reinstatement, including providing one-on-one continuing legal education regarding

ethical challenges in client representation. Through these interactions, Respondent has at all times presented himself as a conscientious lawyer who has learned from his mistakes and vows to correct them.

22. In Respondent's words, "If I am reinstated, I will practice in a modest and smaller manner than before my suspension. In catching up on my CLE requirements, I looked for presentations that particularly focused on recent events, opening a small practice, and recent updates regarding rules and Wyoming Supreme Court opinions (both civil and criminal)." *Id.*, ¶ 15. "If I am reinstated, I believe I have planned accordingly to start small and assist the people of Wyoming. I want a small practice that is client-driven. I believe that the efforts I have made show that I am fit for the practice of law."

23. Finally, Respondent enjoys the support of his colleagues, as evidenced by the letters of recommendation submitted to the Review Panel. These peers will no doubt serve as a valuable support system as Respondent returns to the practice of law. Moreover, three of the complainants in the underlying disciplinary cases, two of whom were district court judges, wrote letters in support of Respondent's reinstatement.

24. Respondent timely filed a Verified Petition for Reinstatement on November 9, 2020, and paid the requisite $500.00 filing fee. The Verified Petition states, and Bar Counsel stipulates, that the Verified Petition satisfies the requirements of Rule 22(b)(3), W.R.Disc.P.

25. In accordance with Rule 22(b)(5), W.R. Disc.P., copies of the Verified Petition were served upon all complainants in the underlying disciplinary proceedings, who were given thirty days to submit their written comments to the BPR. The three complainants who responded all support Respondent's reinstatement.

9

26.    In light of the foregoing, the Review Panel finds that Respondent has met the requirements of Rule 22, W.R.Disc.P. and should be reinstated.

## Conclusions of Law

27.    Determinations regarding a suspended or disbarred lawyer's reinstatement are made pursuant to Rule 22, W.R.Disc.P. Rule 22(b) provides, "An attorney who has been disbarred or suspended for a period of greater than six (6) months may seek to return to active status by filing a verified petition for reinstatement with the BPR and serving a copy on Bar Counsel."

28.    Rule 22(b)(3) provides:

(3) The verified petition for reinstatement shall set forth the facts other than passage of time and absence of additional misconduct upon which the petitioning attorney relies to establish that the attorney possesses all of the qualifications required of applicants for admission to the Wyoming State Bar, fully considering the previous disciplinary action taken against the attorney, and shall include certification that:
   (A)    The attorney is current on the payment of annual license fees and any late charges;
   (B)    The attorney has complied with all continuing legal education requirements during the disciplinary period and has paid all necessary fees;
   (C)    Restitution has been made as ordered to any persons and the Client Protection Fund, including the source and amount of funds used to make restitution; and
   (D)    The attorney has complied with all requirements of the Court's disciplinary order.

29.    Rule 22(b)(4) provides:

(4) The attorney seeking reinstatement must prove by clear and convincing evidence that the attorney has been rehabilitated, has complied with all applicable disciplinary orders and with all provisions of these rules, has not engaged in the unauthorized practice of law, and is fit to practice law.

30.    Rule 22(b)(6) provides in relevant part:

(6) *Reinstatement proceedings following disciplinary suspension or disbarment.*

10

(A) Immediately upon receipt of a verified petition for reinstatement, Bar Counsel shall conduct any investigation Bar Counsel deems necessary. The petitioner shall cooperate in any such investigation.

(B) Following investigation, Bar Counsel and the attorney may stipulate to reinstatement by submitting to the BPR a written stipulation and affidavit of the attorney which provides a detailed description of the factual basis for compliance with the requirements for reinstatement. Any such stipulation shall be approved or disapproved by a Review Panel. If the stipulation is approved, a report and recommendation shall be transmitted to the Court. If accepted by the Court, the Court shall issue its order stating that the attorney is reinstated to the practice of law, which may include any conditions the Court deems appropriate'

## Recommendation

The Hearing Panel recommends that Respondent be reinstated to the practice of law.

DATED this __11th__ day of December, 2020.

Jeffrey A. Donnell
Review Panel Chair
Board of Professional Responsibility
Wyoming State Bar